# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 1, 2013

## STATE OF TENNESSEE v. JAMES CHESTEEN

**Direct Appeal from the Criminal Court for Shelby County**
**No. 11-01798     W. Mark Ward, Judge**

**No. W2012-01998-CCA-R3-CD  - Filed August 29, 2014**

A Shelby County Criminal Court Jury convicted the appellant, James Chesteen, of rape of a child, and the trial court imposed a sentence of twenty-five years in the Tennessee Department of Correction.  On appeal, the appellant challenges the sufficiency of the evidence supporting his conviction and the trial court's decision to admit a photograph of the victim taken by a nurse practitioner at the Our Kids Center.  Upon review, we conclude that the evidence is sufficient but that the trial court's admission of the photograph was reversible error.  Accordingly, the appellant's conviction and sentence are reversed, and the case is remanded for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Reversed; Case Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JERRY L. SMITH, J., joined.

Stephen Bush (at trial and on appeal), Harry E. Sayle, III (on appeal), and Brent Walker and Donna Armstard (at trial), Memphis, Tennessee, for the appellant, James Chesteen.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Terre Fratesi, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The appellant was charged with rape of a child, specifically B.J., who was his

girlfriend's daughter.[1]  At trial, the victim's stepfather, Eric Logan, testified that he lived in Horn Lake, Mississippi, with the victim and his two biological daughters, whose mother was the victim's mother.  When the victim was one year old, Logan went on a date with the victim's mother.  Upon hearing about the date, the victim's biological father called and told them "to come pick her up and she would be in her car seat on the side of the road."  Logan did so, and since then, he had loved and cared for the victim as if she were his biological daughter and referred to her as his daughter.  Logan and the victim's mother were married at the time of trial, but they did not reside together.

Logan said that in 2009, he pled guilty to misdemeanor theft and spent two weeks in jail.  After his release, he returned to the residence he had shared with the victim's mother, the victim, and his two daughters; however, no one was in the residence, and all of the clothes and furniture were gone.  Later, he learned that the three children and the victim's mother were living with the appellant on Morningside in the Frayser area of Memphis.

Logan stated that the three children spent Memorial Day 2010 with him.  To celebrate, he cooked twenty pounds of chicken, pork, and beef.  The children displayed an unusually large appetite and completely consumed the food within two days.  Logan noticed that the victim seemed "like she had a lost soul" and that "[h]er eyes looked blank."

Logan stated that after Memorial Day, he visited the appellant's residence to get the children's clothes; however, he was unable to salvage any of the children's belongings because of the deplorable state of the home.  He noticed that there was very little food in the house to feed the children.  Thereafter, Logan filed a complaint with the Department of Children's Services (DCS) regarding the conditions of the home, and he obtained "physical and legal custody" of all three children.

Logan said that on June 27, 2010, he was outside smoking a cigarette when the victim approached him and said, "[D]addy, I have something to tell you."  After that conversation, Logan filed a police report accusing the appellant of molesting the victim.  Subsequently, Logan took the victim to the Child Advocacy Center for a medical examination and a forensic interview.  The victim was also interviewed by the police and by DCS social workers.

Logan stated that the victim had to repeat the third grade because of poor attendance.  At the time of trial, her school work and attendance had improved vastly.  The victim was seeing a therapist and a psychiatrist, and she was taking Adderall to treat attention deficit hyperactivity disorder (ADHD).  She was also prescribed "a nerve medication and a

---

[1]It is the policy of this court to refer to minor victims of sexual crimes by their initials.

depression medication" but was able to stop taking those medications in June 2012.

Logan said that although he did not have "fond feelings" toward the appellant, he had not encouraged the victim to lie about anything the appellant did to her.

On cross-examination, Logan acknowledged that in October 2009, his arm was broken in an altercation with the appellant. Logan clarified that the children were in his physical custody in May 2010; he obtained legal custody in September 2010.

On redirect examination, Logan stated that neither the victim's mother nor biological father provided a home for the victim; therefore, he had no difficulty obtaining custody.

The victim testified that she was born on November 6, 2000, and that she was eleven years old at the time of trial. She said that she was living with her stepfather and that she rarely saw her mother or biological father.

The victim said that when she was living with her mother and two sisters in Frayser, the appellant occasionally would visit. One day, the appellant came to their home while her mother was working at a Sonic restaurant. The victim's sisters were in their bedroom, and the victim was sitting or lying on her mother's bedroom floor, wearing monkey pajamas and watching television. The appellant walked into her mother's bedroom. He was naked and told the victim to take off her clothes. After the victim complied, the appellant grabbed her hands and dragged her to the bed. The victim said that it hurt and that she was scared. The appellant put the victim on her back on the bed, then he got on top of her and penetrated her vagina. The victim referred to her vagina as her "booty" and to the appellant's penis as "his thing." The victim initially stated that she did not feel the victim's penis penetrate her, but she later stated that it hurt and made her feel "weird." The victim told the appellant to get off her, but he refused and held her down. The victim said that she could still feel the appellant's penis inside of her. Shortly thereafter, the victim managed to push the appellant away. She quickly redressed and went to her bedroom, where she remained until her mother returned home.

The victim said that during the rape, the appellant threatened to shoot her if she told anyone. His threat frightened her. She did not tell her sisters or mother what the appellant had done because she was concerned that her mother would not believe her. The victim was unable to remember the exact day the offense occurred; however, she thought it happened shortly before her ninth birthday, which was on November 6, 2009.

The victim said that while she was living with her mother in Frayser, her attendance at school was poor, she did not have enough food to eat, and the house was dirty. The victim

did not feel safe in the house and did not trust her mother. The victim wanted to talk with Logan but her mother would not allow it. After the victim went to live with Logan, he was the first person she told about the molestation. The victim said that she had "forgot about" the offense and had "moved on." She said that the appellant molested her only once. The victim asserted that no one had told her to lie about the appellant and that she knew lying was wrong.

On cross-examination, the victim said that in November 2009, she cooked for the family because her mother would not cook. The victim did not know how to use the stove or oven, so she would heat food in the microwave. If there were no microwavable food in the house, the victim's mother would tell her "to eat bologna or a Pop Tart." The victim acknowledged that she liked living with Logan much more than living with her mother.

The victim said that on the day of the offense, the appellant was at the house to babysit the girls. When the appellant molested her, the victim did not try to run because she feared he would hurt her. The victim asserted that she did not like the appellant but that he was not mean to her. She explained that she did not scream because the appellant covered her mouth. Afterward, he penetrated her. During the penetration, one of the appellant's hands was on the bed and the other was covering her mouth. The victim struggled and tried to scream. She told the appellant to stop, may have kicked him, and used her hands to push him away. After the appellant got up, the victim grabbed her clothes and quickly dressed. She ran to her bedroom and locked the door until her mother returned home from work. The victim said that she was "angry inside" but that she did not cry because she did not want her sisters to know something was wrong.

The victim acknowledged that in July 2010, she spoke with Teresa Onry about the abuse. During cross-examination, defense counsel showed the video-recorded interview to the jury. During the interview, the victim said that she was lying on the bed watching television when the appellant approached her. On the video, the victim said that after the incident, she first ran to the living room, but when the appellant came into the room, she ran to her bedroom and locked the door. The victim acknowledged that she told Onry that the abuse occurred on November 8, 2009, which was two days after the victim's ninth birthday.

On redirect examination, the victim said that she had tried to remember and tell the truth about everything. She knew that the offense happened "very near" her ninth birthday. She could not recall definitively if the offense happened before or after her birthday.

Teresa Onry testified that she was a forensic interviewer with the Memphis Child Advocacy Center. On July 6, 2010, Onry interviewed the victim. The victim displayed "appropriate knowledge of body parts." The victim referred to a penis as "a w[ie]ner" and

to a vagina as "a booty." During the interview, the victim said that she was in her mother's bedroom watching television when the appellant came into the room, told her to remove her clothes, got on top of her, and penetrated her vagina with his penis.

Onry opined that at the time of the interview, the victim was not "time sense developed" and could not give many details about specific dates.

On cross-examination, Onry said that the first time she asked the victim if something had happened with the appellant, the victim said no. When Onry asked "what happened," the victim revealed the abuse. Onry asked the victim what month the abuse occurred, and the victim answered that it happened two days after her ninth birthday.

On redirect examination, Onry said that when the victim began to reveal the details of the abuse, she became "fidgety" and "teary eyed."

Memphis Police Sergeant M. Kaleta-Gonzalez testified that in 2010, she worked in the CAC investigating claims of child abuse. Sergeant Kaleta-Gonzalez and Sergeant Sharon Kelly worked together to investigate the claim that the appellant molested the victim. As part of the investigation, they interviewed the appellant on September 8, 2010. The appellant was advised of his Miranda rights, and he agreed to give a statement. During the interview, the appellant said that in November 2009, he was working as a truck driver and that he was living with the victim, her mother, and her sisters on Morningside. The appellant acknowledged that he was at the residence on the victim's birthday. On November 8, 2009, the appellant left around midmorning to go to work in Searcy, Arkansas. The appellant denied that the victim had ever seen him naked. He said, however, that he saw the victim naked once when he helped her mother clean her up after she had gotten sick. The appellant denied the victim's allegations of sexual abuse.

Pediatric nurse practitioner Mary Daley testified that on July 12, 2010, she examined the victim after her stepfather brought her to the CAC. The victim was nine years and seven months old; four feet, seven inches tall; and weighed seventy-two pounds. Daley and the victim looked at a book together, and the victim "had trouble sounding out the words."

Daley said that when she asked the victim if she knew the reason for the examination, the victim responded that the appellant gave her a "bad touch two days after [her] birthday," which was on November 6, 2009. Daley asked if the victim was uncomfortable or scared, and the victim replied, "[I]f I tell anybody he's going to shoot me." Daley stated that the eight-month delay between the offense and the examination was not unusual, noting that children often do not reveal abuse "until they feel safe telling someone." Given the length of time since the offense, Daley did not expect to find medical evidence of an injury

attributable to the abuse, and she knew that no DNA evidence would exist because more than seventy-two hours had elapsed since the offense.

Daley used a "schematic diagram of the exterior of a female genitalia" to assist her testimony. She explained that the hymen was a circular muscle that looked "like a bagel." In order to assess whether the hymen had been damaged, Daley examined it for markings or variations that were not normal. Daley found nothing to indicate that the victim had been sexually assaulted within the forty-eight hours prior to the exam. Daley said that a small, "V shaped notch" was located at the top of the hymen. Daley said "that is not technically indicative of a particular injury. In a child her age that can be a normal . . . variant." Daley took a photograph of the victim's vaginal area, and the photograph was shown to the jury. Daley explained that the hymen showed no indication that the victim had gone through puberty. Daley was not surprised to find no evidence of injury, especially given the length of time since the abuse and the ability of that area of the body to heal quickly. She said that the lack of physical findings did not mean that the victim was not abused.

On cross-examination, Daley said that because the victim had not gone through puberty, she did not have estrogen in her system; therefore, the genital tissues were not as elastic as they would be after puberty. Nevertheless, the lack of elasticity did not necessarily mean that a sexual assault would have left damage that would be visible eight months later. Daley opined that without estrogen, the victim would have experienced some pain upon penetration, "depending on the size, the amount of force used, what was used, how far it went." She reiterated that her findings did "not confirm or discount sexual assault." Daley stated that a child could lie about a sexual assault but that it happened "very rarely." Defense counsel asked, "[W]hy put a traumatized child through this process if you're saying with that period of time you're not going to find anything anyway?" Daley responded, "Because sometimes you do."

The first defense witness, Anthony Cole testified that he was the manager of the Sonic restaurant where the victim's mother worked. Upon examining the restaurant's business records, Cole determined that the victim's mother worked from 11:19 a.m. to 4:57 p.m. on November 8, 2009.

On redirect examination, Cole said that in November 2009, the victim's mother worked on the following days: the first to the thirteenth, the sixteenth to the twentieth, and the twenty-second to the twenty-fifth.

Mark Randall Averesch testified that he was the controller in charge of financial matters for the Pallet Factory. Averesch stated that the appellant worked as a truck driver for the company in November 2009. Specifically, the appellant worked on the second through

the fourth, the sixth, and the ninth through the thirteenth; however, the appellant did not work on November 8.

Lawanda Ballentine testified that the appellant had also worked for Ballentine Trucking as a truck driver. On November 8, 2009, he left with a load from the CSX terminal at 11:45 a.m. The load was delivered to Walmart in Searcy, Arkansas, at 7:34 p.m. Ballentine said that the appellant may have come to Ballentine Trucking before picking up the shipment; however, she could not confirm that he did.

On cross-examination, Ballentine said that while making the delivery on November 8, the appellant picked up another shipment at 12:40 p.m. and delivered it at 1:01 p.m. She explained that it was not uncommon for a truck driver to do a "small run" while making another delivery. Ballentine said that she did not think that driving from Memphis to Searcy should take six hours but that she was "not really sure."

The jury convicted the appellant of rape of a child. Thereafter, the trial court sentenced the appellant to twenty-five years in confinement. On appeal, the appellant contends that the evidence is not sufficient to support the conviction and that the trial court erred by admitting a photograph of the victim's vaginal area.

## II.  Analysis

### A. Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and

circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

Rape of a child is the "unlawful sexual penetration of a victim by the defendant . . . if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7).

The evidence, viewed in the light most favorable to the State, was that the victim was in her mother's bedroom watching television when the appellant walked into the room. He was naked and ordered her to disrobe. The victim complied. The appellant grabbed her hands and dragged her to the bed, hurting her. Once the victim was on the bed, the appellant got on top of her and penetrated her vagina with his penis. The victim told the appellant to get off of her, but he refused and held her down. The victim said that she felt the appellant's penis inside of her. During the rape, the appellant put his hand over the victim's mouth so she could not scream. Eventually, the victim pushed the appellant away. As the victim was leaving the room, the appellant threatened to shoot her if she told anyone about the incident. The victim explained that she did not disclose the abuse until she felt safe.

The appellant complains that no witnesses or forensic evidence corroborated the victim's testimony. He further complains that the victim's credibility is "sketchy," noting that she did not immediately disclose the abuse and that she could not definitively remember when the offense occurred. However, our courts have repeatedly held that the testimony of a rape victim, including a child, is sufficient standing alone to sustain a conviction. See State v. Elkins, 102 S.W.3d 578, 582-83 (Tenn. 2003); State v. McKnight, 900 S.W.2d 36, 48 (Tenn. Crim. App. 1994); State v. Warren Curnutt, No. M2006-00552-CCA-R3-CD, 2007 WL 1482390, at *11 (Tenn. Crim. App. at Nashville, May 22, 2007). Although the victim was unable to ascribe a specific date or time to the offense, she knew that the offense occurred sometime around her ninth birthday. See State v. Shelton, 851 S.W.2d 134, 137-38 (Tenn. 1993). Determining the credibility of witnesses is within the purview of the jury. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). In the instant case, the jury clearly resolved the issue of credibility in the State's favor. We may not now reconsider the jury's credibility assessment. See State v.

Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). We conclude that the evidence is sufficient to support the appellant's conviction of rape of a child.

## B. Admission of Photograph

Next, we will address the appellant's complaint regarding the admissibility of a photograph taken during a forensic examination of the victim.

Prior to trial, the State indicated its intention to admit several photographs taken during the victim's examination, including a photograph of the victim taken at the beginning of the examination and photographs of the victim's vaginal area. Defense counsel filed a motion in limine, which was heard immediately prior to trial, objecting to the photographs of the victim's vaginal area, contending that the photographs were irrelevant, inflammatory, and prejudicial. Defense counsel argued that, in view of Daley's testimony that no injuries were shown on the photographs, there was no reason "to show the jurors, even put the jurors to the fact of having to see personal pictures of a young girl like this." The State responded that the victim had no visible injuries, in part, because the examination took place approximately eight months after the offense. The State further explained that the nurse took the photographs as a normal part of the sexual assault examination and that the photographs would assist the nurse in "demonstrat[ing] to the jury exactly what she's talking about when she explains what those parts of the body are and why it's perfectly normal eight months after the assault not to see any tears, not to see any healed scars and things of that nature." The State also contended that the defense would likely assert that the victim fabricated the offense "to please some other adult." The State asserted that "what these photos show is that this little girl laid on her back with her knees in the air and allowed her vagina and her genitalia to be spread, poked and prodded and photographed and lit up by a stranger for a lengthy exam." The State further asserted that "the victim submitted to the indignity of a probing physical examination [that] included photographs being taken of her vagina . . . [which] makes it more probable that her account of sexual abuse was true."

The trial court allowed the State to introduce one photograph of the victim's vaginal area, explaining that it had "some relevance" to explain the lack of injuries to the victim. The photograph, which measured eight and one-half inches by eleven inches, was in color and was taken at very close range. Regarding prejudice, the trial court said:

> The vagina, I'm assuming, it's flexible and what not, the things we hear in all these other cases. And I do think that at least this one is relevant to that, to explain what was going on as far as why there might not be any injuries in here. . . . [T]hey're just pictures of a vagina . . . .

The court found that the admission of one photograph of the area would not be "overly prejudicial." The court also allowed the State to introduce the photograph of the victim taken immediately before the examination. On appeal, the appellant challenges the admissibility of the photograph of the victim's vaginal area.

Generally, decisions concerning the admissibility of evidence at trial are entrusted to the discretion of the trial court. See State v. Robinson, 146 S.W.3d 469, 490 (Tenn. 2004). "A trial court's exercise of discretion will not be reversed on appeal unless the court 'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" Id. (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)); see also State v. Dickerson, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993).

In determining the admissibility of photographs, trial courts must evaluate them in light of Tennessee Rules of Evidence 401 and 403. See State v. Banks, 564 S.W.2d 947, 949-51 (Tenn. 1978). In order to be admissible, a photograph must be relevant and its probative value must outweigh its potential to cause unfair prejudice. See Tenn. R. Evid. 403. Relevance is broadly defined as "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. In considering whether photographs are relevant, trial courts must consider the questions of fact that the jury will have to consider in determining the accused's guilt, as well as other evidence that has been introduced during the course of the trial. State v. Williamson, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995). When deciding whether photographs pose a risk of unfair prejudice, trial courts must consider whether the photographs have "[a]n undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one." Banks, 564 S.W.2d at 951 (citation and internal quotations omitted); see also State v. Price, 46 S.W.3d 785, 815 (Tenn. Crim. App. 2000). In other words, photographs must be relevant to some part of the prosecution's case and must not be admitted solely to inflame the jury and prejudice them against the defendant. See Banks, 564 S.W.2d at 951. Further, photographs are not necessarily rendered inadmissible because they are cumulative to other evidence or because descriptive words could have been used instead. See Collins v. State, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973).

On appeal, the State argues that the photograph is admissible for two reasons. First, the State again maintains that the photograph is relevant to the victim's credibility, noting that the outcome of the case depended upon whether the jury believed the victim or the appellant. The State maintains that the defense's theory was that the victim invented the story of sexual abuse in order to be reunited with Logan and that admission of the photograph was necessary to bolster the victim's credibility. The State contends that "[t]he photograph counters [the defense] theory, since it demonstrates that the victim submitted to the indignity

of a probing physical examination which included photographs being taken of her vagina. That the victim was willing to do this makes it more probable that her account of sexual abuse was true." The State has cited no authority in support of this position, and the record is devoid of any evidence that the young victim had any prior knowledge of the specific nature of the examination. Moreover, the trial court did not admit the photograph on this basis. Therefore, we will turn to the State's second argument for admission.

The State asserts that "the photograph was relevant to illustrate Nurse Daley's testimony with regard to the lack of injury to the victim's hymen" and that the photograph was not unduly prejudicial, explaining that "[i]t was taken in a detached clinical setting and looked like it could be from a medical textbook." In support of its position, the State cites this court's opinion in State v. Tommy Dale Taylor, Sr., No. W2008-01006-CCA-R3-CD, 2009 WL 1929159 (Tenn. Crim. App. at Jackson, July 6, 2009). In that case, the victim told a nurse that the defendant had touched her vaginal area but denied that the defendant had touched her anal area. Id. at *2. However, during an examination, the nurse found "fissures," indicating that the area had scarred after an injury. Id. at *3. The nurse explained that children are sometimes unwilling to disclose the extent of the abuse and that children are occasionally unable "'to identify exactly where on their bodies an assault has occurred.'" Id. At trial, the State submitted a photograph of the victim's vaginal and anal regions, which depicted the fissures. Id. On appeal, the defendant challenged the trial court's admission of the photograph, contending that the photograph was highly prejudicial and irrelevant because the victim denied that she had been anally penetrated by the defendant. Id. at *10. This court agreed with the State's argument that "the photograph was relevant both to show the injuries to the victim's anus and the close proximity of her anus to her vagina, which supported [the nurse's] testimony that a young child often has difficulty distinguishing where on her body an assault has occurred." Id. at *11. We concluded that the probative value of the photograph was not substantially outweighed by the prejudicial effect. Id.

In the instant case, the record reveals that during Daley's testimony, the State first introduced a photograph of the victim that was taken prior to the beginning of her examination. In the photograph, the victim was fully dressed, standing in front of a measuring tape, and smiling. The victim appeared young and vulnerable. Immediately thereafter, the State introduced the contested photograph, which, as we have noted, was in color and was taken mere inches from the victim's vaginal area and showed no injuries. The contrast between the two photographs, shown one after the other, could not fail to elicit great sympathy for the victim and contempt for the appellant. As we have noted, Daley testified extensively and in great detail using a schematic drawing and a power point presentation to explain the construction of the vaginal area and the reasons for the lack of injury. Given her detailed expert testimony regarding the examination, the photograph was uncalled for and had almost no probative value on the issues not covered by the testimony. We conclude that

-11-

the probative value of the photograph was substantially outweighed by the potential for unfair prejudice. Accordingly, we conclude that the trial court abused its discretion in allowing the admission of the photograph.

Our conclusion does not end our analysis; we must now determine the effect of the error, specifically whether the error "'more probably than not affected the judgment or would result in prejudice to the judicial process.'" State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008) (quoting Tenn. R. App. P. 36(b)); see also State v. Michael Jason Vance, No. M2011-02469-CCA-R3-CD, 2013 WL 6001954, at *20 (Tenn. Crim. App. at Nashville, Nov. 12, 2013). This court has recently observed that "[i]f a photograph should have been excluded because it adds 'little or nothing to the sum total of knowledge of the jury,' the admission of the photograph, unless somehow prejudicial because of its content, typically qualifies as harmless." Vance, No. M2011-02469-CCA-R3-CD, 2013 WL 6001954, at *20. Nevertheless, if the admission of the evidence affects "a 'substantial right' of a party," such error may require reversal. Neil P. Cohen et al. Tennessee Law of Evidence § 1.03[3][b] (LEXIS publishing, 6th ed. 2011). Generally, "an error affects substantial rights when it causes actual prejudice because it had [a] substantial and injurious effect or influence in determining the jury's verdict." Id. (internal quotations omitted).

In the instant case, the State had no physical proof of the appellant's guilt. Instead, as the State recognized, the proof against the appellant came primarily from the testimony of the victim. In determining the effect of the photograph, we are particularly concerned by the fact that the State's entire closing argument centered around the importance of the photograph in determining the victim's truthfulness. Notably, the State argued:

> And if she is making this up do you really think she's going to lie on her back with her feet spread in the air and have her picture taken of her vagina. Wouldn't that had been a child – a time for a child who is lying to butt out and say oh, oh, oh, oh, I made it up, daddy, get me out of here. I don't want to have a picture taken of my vagina, my booty. And, no, she sat through that. She got poked and prodded and had her labia spread and photographed.

This court has cautioned that "[p]rejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" State v. Thomas J. Tackett, No. M1999-02541-CCA-R3-CD, 2001 WL 721852, at *4 (Tenn. Crim. App. at Nashville, June 28, 2001) (quoting M. Graham, Handbook of Federal Evidence 182-83 (2d ed. 1986)). As we earlier concluded, the primary effect of the photograph was to elicit sympathy for the victim and contempt for the appellant while adding

nothing of evidentiary value to the State's case. Because the entire case depended on whom the jury believed, we are compelled to conclude that the admission of the photograph was not harmless.

### III.  Conclusion

Based upon the record and the parties' briefs, we conclude that the proof was sufficient to sustain the appellant's conviction of rape of a child. We conclude, however, that the trial court erred by admitting a photograph of the victim's vaginal area and that the error was not harmless. Therefore, the appellant's conviction and sentence are reversed, and the case is remanded to the trial court for a new trial.

_____
NORMA McGEE OGLE, JUDGE